**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

JASON F. CHILDS,

Debtor.
_______________________________/

Case No. 25-40786-PRH
Chapter 7
Judge Paul R. Hage

TITLE RESOURCES GUARANTY COMPANY, AS SUBROGEE OF BRIAN REAVER JR. AND BRIAN RICHARD REAVER,

Plaintiffs,

v.

JASON F. CHILDS,

Defendant.
_______________________________/

Adv. No. 25-04086-PRH

## OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. Introduction

This matter came before the Court on the *Motion for Summary Judgment* [Doc. No. 76] (the "Motion") filed by Jason F. Childs ("Defendant"). Defendant asks this Court to dismiss the *Complaint for Nondischargeability of Debt* [Doc. No. 1] (the "Complaint") filed by Brian Reaver Jr. and Brian Richard Reaver (collectively, the "Reavers"). Subsequent to the filing of the Complaint, the Court entered its *Order Regarding Plaintiffs' Motion To Join Title Resources Guaranty

*Company As Plaintiff* [Doc. No. 90], which substituted Title Resources Guaranty Company ("TRG"), a title insurance company, into this adversary proceeding as the named plaintiff for purposes of allowing it to prosecute the Complaint solely in its capacity as the subrogee of the Reavers.

The Complaint asserts a single claim for nondischargeability of debt against Defendant pursuant to section 523(a)(2)(A). This claim is based upon Defendant's allegedly fraudulent misrepresentations relating to the encumbered status of residential real property that Defendant caused to be transferred to the Reavers. Defendant argues that Count I must be dismissed pursuant to Rule 56 of the Federal Rules of Civil Procedure, which is made applicable in this adversary proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.[1]

The Court concludes that Defendant is entitled to summary judgment with respect to the sole count in the Complaint. Therefore, the Complaint and this adversary proceeding shall be dismissed. A separate order shall be entered.

## II. Factual Background[2]

---

[1] The Bankruptcy Code is set forth in 11 U.S.C. § 101 *et seq*. Specific chapters of the Bankruptcy Code are identified herein as "chapter __" and specific sections of the Bankruptcy Code are identified herein as "section __." Similarly, specific rules of the Federal Rules of Bankruptcy Procedure are identified herein as "Bankruptcy Rule __" and specific rules of the Federal Rules of Civil Procedure are identified herein as "Civil Rule __."

[2] The Court understands that the facts, as set forth herein, are not disputed by the parties in any material way.

At all times relevant to this adversary proceeding, Defendant was the sole member of Nottingham Homes, LLC ("Nottingham"). On September 27, 2023, Nottingham entered into an agreement to sell a parcel of residential real property located at 651 N. Cass Lake Rd., Waterford, Michigan (the "Property") to the Reavers for $207,000. Pursuant to their agreement, Nottingham provided the Reavers with a title insurance commitment (the "Commitment"). The issuing agent is identified as Vanguard Title Insurance Agency, LLC ("Vanguard") and the issuing office is identified as Doma Title Insurance, Inc. ("Doma").

The closing on the sale of the Property took place on October 26, 2023. The Reavers attended the closing in person, as did Defendant. At or prior to closing, Defendant signed a *Warranty Deed* on behalf of Nottingham conveying fee simple title to the Reavers. Defendant also signed an *Affidavit by Owner* (the "Affidavit") on behalf of Nottingham which, among other things, provided:

> 8. Affiant has no knowledge of any other matters affecting the title including but not limited to: mortgages, liens, land contracts, options or other encumbrances other than those which are set forth in the Commitments; (NONE, unless noted).

*See* Doc. No. 84-16, Affidavit, ¶ 8. The Affidavit does not disclose any mortgages affecting title to the Property. The Affidavit also provides:

> The Owner understands that *Doma Title Insurance, Inc. and the policy issuing agent will rely on this affidavit* when closing a real estate transaction and insuring title to or a security interest in the land and agrees to hold Doma Title Insurance, Inc. and its policy issuing agent harmless from any loss or claim arising because of title insurance

> protection provided a purchaser or lender in reliance in whole or in part on the completeness and correctness of the representations or attestations made herein.

*Id.* (emphasis added).

Unbeknownst to the Reavers, a mortgage on the Property had been given by Nottingham to Civic Financial Services, LLC on September 16, 2022 (the "CFS Mortgage"). Such mortgage was, inexplicably, not identified in the Commitment prepared by the title insurers. The Complaint alleges that the Reavers only became aware of the CFS Mortgage after receiving a foreclosure notice with respect to the Property advising that a foreclosure sale was scheduled for March 9, 2024. A foreclosure sale of the Property subsequently took place, and a sheriff's deed was recorded in favor of Banc of California, the successful bidder at the foreclosure sale.

Brian Richard Reaver testified in an oral deposition conducted in conjunction with this adversary proceeding that, upon receiving notice of the foreclosure sale, he personally travelled to the Oakland County Register of Deeds, instead of simply reviewing an online summary, to review the title documentation with respect to the Property (a step that the title insurers apparently failed to take). *See* Doc. No. 76-3, Brian Richard Reaver Dep., 19:7–25:22. He discovered the previously undisclosed

CFS Mortgage. *Id.* Upon discovering the CFS Mortgage, he notified Vanguard which, in turn, notified Doma, the underwriter of the Reavers' title insurance policy.[3]

On June 11, 2024, the Reavers filed suit against Defendant and Nottingham in the Oakland County Circuit Court [Case No. 2024-207929-CK] (the "State Court Action"). The State Court Action alleged fraud, innocent misrepresentation and unjust enrichment claims related to the undisclosed CFS Mortgage. On December 19, 2024, the state court entered a *Default Judgment* (the "Judgment") against Defendant and Nottingham in the amount of $189,158.33 as a sanction due to their failure to appear at a court ordered mediation.

Doma paid the redemption funds, $188,245.26, to Banc of California on January 28, 2025, to redeem the property on behalf of its insured, the Reavers. TRG

---

[3] A March 14, 2024 e-mail from John Apostol, an employee of Vanguard, to Defendant provides some explanation for what may have happened here:

> I've been contacted by Brian Reaver, the purchaser of the property at 651 N Cass Lake Rd. He has received notice of a Foreclosure of a Mortgage you (Nottingham Homes LLC) granted to Civic Financial Services LLC in Sept 2022 that looks to cover 6 parcels, including the N Cass Lake Rd property. The Mortgage was subsequently assigned to Banc of California. In reviewing our file and the title exam that was done, it appears this Mortgage was not properly indexed against the property and was not picked up on our title commitment (I note that the split title co did not pick it up either). There was a partial discharge recorded but it did not release the N Cass Lake Rd property. Please review your records to see if you had made a partial payment on the Mortgage that would have released this property. Please contact me with any info or insight you may have, including contact info for the Lender. Obviously this is a serious issue. If the property goes to Sheriff's sale it could increase the cost of resolving this significantly.

Doc. No. 76-5.

is reportedly the successor to Doma by way of a merger that was completed in late 2025.

Defendant commenced this bankruptcy case on January 29, 2025. Although originally filed as a chapter 13 case, the case was converted to a case under chapter 7 on February 25, 2025. On May 9, 2025, the Reavers commenced this adversary proceeding by filing the *Complaint For Nondischargeability of Debt* [Doc. No. 1] (the "Complaint"). The Complaint seeks a determination that the debt owed by Defendant to the Reavers, as evidenced by the Judgment, is nondischargeable pursuant to section 523(a)(2)(A) as a debt obtained by "false pretenses, a false representation, or actual fraud." Specifically, the Complaint alleges:

> 24. Debtor signed the Affidavit knowing that it was false at the time he signed it.
>
> 25. As a result of Debtor's signing the Affidavit, the Reavers went forward with the purchase of the Property and Debtor's wholly-owned entity, Nottingham, received substantially more funds from the Closing than it would otherwise have received if Debtor had disclosed the fact that the Mortgage encumbered the Property.
>
> 26. Debtor intended to deceive the Reavers so as to obtain more money for Nottingham from the Closing.
>
> 27. The Reavers justifiably relied on Debtor's representation that there was no encumbrance on the Property at the time they purchased the Property.

28. Debtor is estopped from denying that he is liable for fraud by virtue of the Judgment.[4]

29. The Reavers, through their title insurer, suffered damages in the amount of $188,245.26.

*See* Complaint, ¶¶ 24-29. Defendant filed an *Answer to Complaint for Nondischargeablity of Debt Under 11 USC § 523(a)(2)(A) and Affirmative Defenses* [Doc. No. 8] on June 20, 2025.

On July 24, 2026, Defendant filed the instant Motion, which seeks summary judgment with respect to the sole count in the Complaint pursuant to Civil Rule 56. Defendant argues, among other things, that: (i) no evidence has been presented to show that he actually made any representations to the Reavers, (ii) the Reavers did not rely on the Affidavit which, by its terms, was expressly directed to Doma, not to them, and (iii) the Reavers have suffered no damages because Doma paid funds to redeem the Property on their behalf. The Reavers filed *Plaintiffs' Answer to Defendant's Motion for Summary Judgment* [Doc. No. 84] (the "Response") on August 7, 2026. Defendant filed his *Reply to Plaintiff's Response to Defendant's Motion For Summary Judgment* [Doc. No. 93] (the "Reply") on September 9, 2026. The Court held a hearing on the Motion on September 14, 2026. At the conclusion of that hearing, the Court took the matter under advisement.

[4] The Reavers subsequently expressly waived any estoppel argument related to the Judgment. *See Brief in Opposition to Defendant's Motion for Summary Judgment*, p. 14.

## III. Standard of Review

Civil Rule 56 is incorporated in bankruptcy cases pursuant to Bankruptcy Rule 7056. Summary judgment is only appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id*. at 247-48. A "genuine" issue is present "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248).

"The initial burden is on the moving party to demonstrate that an essential element of the non-moving party's case is lacking." *Kalamazoo River Study Group v. Rockwell International Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986)). "The burden then shifts to the non-moving party to come forward with specific facts, supported by evidence in the record, upon which a reasonable jury could return a verdict for the non-moving party." *Id.* (citing *Anderson*, 477 U.S. at 248). In meeting their respective burdens of proof,

> [T]he moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury. Essentially, a motion for summary judgment is a means by which

> to "challenge the opposing party to 'put up or shut up' on a critical issue."

*Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

In deciding a motion brought under Civil Rule 56, the Court must view the evidence in the light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). However, the nonmoving party may not rely on mere allegations or denials but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (internal quotation marks and citation omitted).

## IV. Discussion

The sole count in the Complaint is brought under section 523(a)(2)(A) which excepts from the bankruptcy discharge debts for "money, property, [or] services ... to the extent obtained, by ... false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To except a debt from discharge under section 523(a)(2)(A), a plaintiff must prove that:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Services* (*In re Rembert*), 141 F.3d 277, 280–81 (6th Cir. 1998). The standard of proof in an action under section 523(a)(2)(A) is a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654 (1991). Failure to prove any one of the stated elements is fatal to a plaintiff's case. *AmSouth Fin. Corp. v. Warner (In re Warner)*, 169 B.R. 155, 157 (Bankr. W.D. Tenn 1994). Further, given the strong policy favoring discharge of debts in bankruptcy, exceptions to discharge are to be strictly construed against the creditor. *See In re Rembert*, 141 F.3d at 281 (citing *Manufacturer's Hanover Trust v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir. 1988)).

The Court shall address each element of TRG's cause of action in turn.[5]

*a. Material Misrepresentation*

The Complaint does not allege that any verbal representations were made by Defendant to the Reavers related to the existence of any liens encumbering the Property. Indeed, the uncontested evidence presented after the conclusion of discovery suggests otherwise. In their oral depositions, the Reavers both testified that they never spoke with the Defendant. Specifically, in response to questions from counsel for the Defendant, Brian Richard Reaver testified:

Q. When was the first time you spoke with my client, Jason Childs?

[5] At the hearing on the Motion, Defendant argued that he did not "obtain money" from the sale transaction because the Reavers' funds were actually disbursed to Nottingham, his wholly owned entity. Defendant asserted that the Complaint must be dismissed because it does not include "an alter-ego or veil-piercing claim." Because this argument was not raised in the Motion, the Court will not consider it at this time.

A. I have never spoke with your client.
Q. You've never spoken with him?
A. No.
Q. Never talked to him? Do you know what he looks like?
A. I believe he was at closing, but if you were to walk him in the door right now, I would not know who he was.
Q. Okay. Did you ever discuss the property at issue in this case, what is it, 651 – what's the address? 651 North Cass Lake Road?
A. What was the question? I'm sorry.
Q. The property, if I say the property, I'm referring to 651 North Cass Lake Road.
A. Understood.
Q. And that's where your son is living, correct?
A. Correct.
Q. Did you ever discuss that property with Mr. Childs?
A. No.

Doc. No. 76-3, Brian Richard Reaver Dep., 11:8-12:3. Mr. Reaver further testified:

Q. Did Mr. Childs say anything to you at closing?
A. Nothing that I can recall, no.

*Id.* at 14:4-5.

Brian Reaver Jr. similarly testified as follows:

Q. Okay. When was the first time that you spoke with Jason Childs?
A. I never have.
Q. You never have?
A. No.
Q. Never had a conversation with him about the property, asking him questions about the property, anything like that?
A. No, sir.
Q. Okay. First time you met him was at the closing?
A. Yes. I don't believe I ever directly met him.
Q. You were both at the same closing?
A. We were there, yes, but I was never introduced.

Doc. No. 76-4, Brian Reaver Jr. Dep., 10:18-11:5.

Because of the absence of any verbal representations made by Defendant, the focus of the Complaint, the Motion and the related briefing is necessarily on the Affidavit, which is the only representation from Defendant that has been identified in the pleadings. The Reavers alleged in the Complaint that Defendant "signed the Affidavit knowing that it was false at the time he signed it." *See* Complaint, ¶ 24. "As a result of Debtor's signing the Affidavit," they alleged, "the Reavers went forward with the purchase of the Property…." *Id.* at ¶ 25. Finally, the Complaint alleges: "The Reavers justifiably relied on Debtor's representation that there was no encumbrance on the Property at the time they purchased the Property." *Id.* at ¶ 27.

As noted, the Affidavit, which was signed by Defendant, states:

> *Affiant has no knowledge* of any other matters affecting the title including but not limited to: mortgages, liens, land contracts, options or other encumbrances other than those which are set forth in the Commitments.

Affidavit, ¶ 8 (emphasis added). A factual issue exists regarding whether this representation was a misrepresentation. While it is undoubtedly true that title to the Property was affected by the undisclosed CFS Mortgage at the time the Affidavit was signed, it is unclear whether Defendant had knowledge of such encumbrance.

The Reavers alleged that Defendant knew or, as an experienced real estate professional, should have known about the CFS Mortgage, which he executed on behalf of Nottingham just over a year prior to the closing. But Defendant asserts that he understood that the CFS Mortgage had been discharged prior to the closing

on the Property after a recent, partial payoff of the associated loan, which resulted in several associated real estate mortgages being discharged. Such an understanding has more credibility given the fact that neither of the title insurers who were paid to review the real property records for encumbrances discovered the CFS Mortgage. Because the relevant statement in the Affidavit is expressly qualified by Defendant's knowledge, whether the representation in the Affidavit constitutes a misrepresentation is a question of fact that cannot be resolved at this stage of the litigation.

*b. Intent to Deceive*

With respect to the second element for a fraudulent misrepresentation, TRG must prove that Defendant subjectively intended to deceive the Reavers. *See In re Rembert*, 141 F.3d at 281. Courts are required to look at the totality of the circumstances in making this determination. *See Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003).

Defendant has argued that no intent to deceive could exist in this case because there was apparently a title-indexing error at the County level resulting from the partial sale of properties encumbered by the same CFS Mortgage. He notes that two professional title companies, with full access to the public records, missed the encumbrance.

TRG responded by arguing that Defendant "signed the Affidavit knowing that it was false at the time he signed it" and that the existence of an indexing error by a third party does not disprove Defendant's intent to deceive them, especially because there was only one month between when Defendant completed the partial sale of the properties and the signing of the Affidavit. They rely on deposition testimony provided by Defendant in the State Court Action. In any event, TRG argued that subjective intent to deceive is a factual issue that cannot be determined at the summary judgment stage of this litigation.

Under these circumstances, the Court agrees with TRG. The fact that there was an indexing error at the County level does not exclude the possibility that Defendant *also* intended to deceive the Reavers when he failed to disclose the existence of the CFS Mortgage that was previously granted by Nottingham. The Court finds that whether Defendant intended to deceive the Reavers is a question of fact that cannot be resolved at this time.

*c. Justifiable Reliance*

The third element of the *Rembert* test requires TRG to establish that the Reavers justifiably relied upon the Affidavit. *See Field v. Mans*, 516 U.S. 59, 74-75, 116 S. Ct. 437 (1995). "This element has two components. First, there must be a demonstration that the creditor actually relied on the false representation and, second, there must be a demonstration that such reliance was justifiable." *Tweedie*

*v. Hermoyian (In re Hermoyian)*, 466 B.R. 348, 368 (Bankr. E.D. Mich. 2012). "A logical prerequisite for justifiable reliance is a showing by the creditor that it 'actually relied' and that its reliance was then justifiable." *In re Copeland*, 291 B.R. at 767. Based upon the evidence presented to the Court, there is no material question of fact on this issue as TRG has not introduced even a "scintilla of evidence" suggesting that the Reavers relied upon the Affidavit. *Pack,* 434 F.3d at 814.

Defendant argues that the Reavers could not have relied on the Affidavit because that document, on its face, contemplates that it will be relied upon by the title insurers, not the Reavers:

> The Owner understands that *Doma Title Insurance, Inc. and the policy issuing agent will rely on this affidavit* when closing a real estate transaction and insuring title to or a security interest in the land and agrees to hold Doma Title Insurance, Inc. and its policy issuing agent harmless from any loss or claim arising because of title insurance protection provided a purchaser or lender in reliance in whole or in part on the completeness and correctness of the representations or attestations made herein.

*See* Affidavit (emphasis added). While the Affidavit does specify that it will be relied upon by Doma and Vanguard, such language does not necessarily preclude the Reavers from relying upon the Affidavit as well.

However, to that end, both of the Reavers testified that they could not recall if they ever even read the Affidavit, much less relied on it. Brian Richard Reaver testified:

Q. All right. And usually at a closing somebody sits at a table like we're sitting at a conference table and somebody from the title company has a stack of documents, they hand you them, you sign them?
A. Correct.
Q. Did you read any of the documents?
A. Not at that -- I mean briefly maybe some of them, but as far as all of them, no.
Q. Okay. Do you remember anything about the documents you did read?
A. No, I don't.

Doc. No. 76-3, Brian Richard Reaver Dep., 13:7–18. Mr. Reaver continued:

Q. Take a look at the document I just handed you, the Complaint and go down to page eight of 56. Take a look. Do you see paragraph 13? This is the purchase agreement that you entered with -- actually, this is the purchase agreement that your son entered into with Mr. Childs on behalf of Nottingham Homes, correct?
A. If you say so. I don't know.
Q. You were not a party to that?
A. I was not a party to that.
Q. I don't need to ask you about it.
A. The purchase agreement I was not a party to.
Q. Okay. So no representations were made to you in connection with the purchase agreement, correct?
A. That is correct.
Q. Take a look at page 27 of 56. That's entitled Affidavit by Owner. Have you ever seen this document before?
A. If I have, I do not recall.

*Id.* at 30:20–31:13. Similarly, Brian Reaver Jr. testified:

Q. At the closing I asked your father this, there was somebody sitting at the end of the table passing out documents, you signed a bunch of documents?
A. Correct.
Q. All right. Did you read any of the documents?
A. Not in full.

Q. Did you read any of the documents in part?
A. I'm sure I did skim a few, yes.
Q. Do you remember which ones?
A. I do not.
Q. All right. Let's take a look at what we previously marked as Exhibit 4, and on page 27 of 56 there was an affidavit by owner, which was from Mr. Childs. Do you remember reviewing this document?
A. I don't recall.

Doc. No. 76-4, Brian Reaver Jr. Dep., 11:14 – 12:5.

Based on the foregoing testimony, Defendant argues that it cannot credibly be argued that the Reavers justifiably relied on the Affidavit. The burden of proof in rebutting this testimony belongs to TRG; it is their responsibility "come forward with specific facts, supported by evidence in the record," to create a genuine dispute as the justifiable reliance issue. *Anderson*, 477 U.S. at 248. Or, to use the colorful language articulated by the Sixth Circuit Court of Appeals, TRG is required to "put up or shut up" on this critical issue. *Cox v. Ky. Dept. of Transp.*, 53 F.3d at 149.

The Court concludes that TRG has failed to meet this burden. Indeed, throughout the Response, instead of identifying how or when the Reavers allegedly relied upon the Affidavit, TRG focused on Vanguard and/or Doma's reliance on the Affidavit. Any reliance by the Reavers is characterized as "indirect." Specifically, TRG argues that:

- "[T]here is no question that Doma, TRG's predecessor in interest, explicitly relied upon [Defendant's] Affidavit in connection with the underlying transaction and suffered damages in excess of $188,000 in order to prevent the loss of the Property." Response at p. 7.

- Plaintiff "undoubtedly knew that Vanguard Title, as the title agent issuing the Policy on behalf of Doma, would be relying on the Affidavit in order to close the transaction and issue the policy." *Id.* at p. 9.

- "[I]t is not dispositive that the misrepresentation was made to Doma and Vanguard Title as opposed to directly to the Reavers." *Id.* at 9-10.

- Plaintiff "unquestionably made a false representation directly to Doma and Vanguard Title and indirectly to the Reavers that there was no mortgage encumbering the Property." *Id.* at 10.

- "[B]oth Doma and Vanguard Title relied upon the Affidavit in deciding to issue the Policy. Even if this Court were to examine the facts strictly from the Reavers' standpoint there can be no question that they indirectly relied on the Affidavit, inasmuch as they would not have closed the transaction in the absence of title insurance, and they would not have received a Policy without the Affidavit." *Id.*

- "Furthermore, the reliance by Doma and Vanguard Title and the indirect reliance by the Reavers was justifiable. *Id.* at p. 11.

- "Doma and Vanguard Title justifiably relied upon the false representation, and pursuant to the Restatement 2nd of Torts, such reliance extends to the Reavers." *Id.* at p. 12.

- "Here there was unquestionably a loss suffered as a result of Doma and Vanguard Title's reliance on the Affidavit, which, as noted above, the Reavers indirectly relied upon." *Id.*

General allegations such as the foregoing are insufficient to satisfy the requirements of Civil Rule 56(c)(1), which requires a party asserting that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1).

TRG has failed to cite any factual evidence that would support their claim that the Reavers relied on the Affidavit. Indeed, the only evidence put forth at all, other than various transactional documents, was: (i) the *Affidavit of John Apostol*, and (ii) a transcript of Defendant's oral deposition in the State Court Action. The affidavit from Mr. Apostol once again focuses on Vanguard's reliance on the Affidavit, stating: "*Vanguard Title relied upon the Affidavit* in disbursing the sum of $192,172.65 to Nottingham following the closing and in issuing the Policy." Doc. No. 84-19, Affidavit of John Apostol, ¶ 9, (emphasis added).[6] And TRG did not direct the Court to any testimony in the deposition transcripts that supports its argument that the Reavers relied upon the Affidavit.

TRG's legal theory of "indirect reliance" can be summarized as follows. Defendant's allegedly false Affidavit was part and parcel of the overall transaction. The title insurers relied on the Affidavit. The Reavers may not have seen the Affidavit or even been aware of its existence. But they relied on the Affidavit nonetheless because the transaction was not going to close unless the Reavers

[6] It may be that Vanguard or Doma could have asserted a direct fraud claim against the Defendant based on the representations in the Affidavit. Such entities may well have relied on the Affidavit in issuing the Commitment, although whether such reliance would be reasonable in light of their respective roles in the transaction is a different question. Regardless, neither Vanguard nor Doma timely filed a complaint under section 523(a) seeking a determination that such claims, if proven, should be excepted from discharge. And the allegations contained in the Complaint, which lists the Reavers as the only plaintiffs, cannot plausibly be read to incorporate any direct claims belonging to the title insurers. Thus, such claims were discharged in Defendant's underlying chapter 7 case. *See* 11 U.S.C. § 727(b).

received title insurance. And the Reavers wouldn't have received title insurance without the Affidavit.

Regarding TRG's "indirect reliance" theory, the Court accepts that, in certain instances, a debtor's liability for a fraudulent misrepresentation may extend to indirect recipients of the false statement, if they are parties the misrepresentation could be reasonably expected to reach. Restatement (Second) of Torts § 531 (1977) provides that:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

The Restatement stands for the proposition that statements, such as those in the Affidavit, *could* have been relied upon by parties such as the Reavers, even if the Reavers were not the parties to whom the Affidavit was specifically directed.

At the hearing on the Motion, the Court asked counsel for TRG whether he could identify any analogous caselaw to support his "indirect reliance" theory. The only caselaw identified by counsel, which was not cited at all in the Response, was *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 136 S. Ct. 1581 (2016). The Supreme Court's opinion in *Husky* does not support the Reavers' position. It stands for the proposition that the term "actual fraud" in section 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false

representation. *Husky* does not stand for the proposition that "an inducement-based fraud" claim, such as the claim pled by the Reavers in the Complaint, can proceed without reliance on a misrepresentation by the defendant. *Id.* at 361-362. In fact, *Husky* does not address or discuss an "indirect reliance" theory at all.

The Court was able to identify one case discussing a theory of "indirect reliance" which contained similar facts to the facts in this adversary proceeding. In *First Horizon Home Loan Corp. v. Apostle (In re Apostle)*, 467 B.R. 433 (Bankr. W.D. Mich. 2012), a real estate closing statement failed to disclose outstanding liens on a transferred parcel of real property. Purchasers of the real property subsequently brought nondischargeability actions against the seller under section 523(a)(2)(A) based on this misrepresentation. Judge James D. Gregg found that the "false and inaccurate" closing statement was likely submitted by the defendant to the escrow or title agent who handled the closing, but not to the plaintiffs. Citing to the Restatement (Second) of Torts, Judge Gregg held that: "In certain instances, a debtor's liability for a fraudulent misrepresentation may extend to … indirect recipients of the false statement, if they are parties the misrepresentation could be reasonably expected to reach." *Id.* at 441.

But, in *Apostle*, the court dismissed plaintiffs' claims because, "Although it may have been reasonable to expect that the representations in the Sellers' Closing

Statement would be shared with the [purchasers], there is *no evidence* that actually occurred." *Id.* at 442 (emphasis in original). To the contrary, Judge Gregg stated:

> It is undisputed that neither [of the purchasers] spoke with [the seller] in connection with the closing. Not once. The [purchasers] did not even know [the seller's] name until years after the transaction was completed. Without evidence that the [purchasers] actually received a copy of the closing statement or even knew it existed, it is impossible to conclude [that seller] made a misrepresentation or omission, either directly or indirectly, to them. The first element of the Plaintiffs' nondischargeable fraud cause of action has not been met.

*Id.* at 442.

As in *Apostle*, the problem with TRG's "indirect reliance" theory in this adversary proceeding is that TRG has failed to put forth any evidence to rebut the deposition testimony relied upon by the Defendant, which suggests that the Reavers *did not* even read the Affidavit, much less rely upon it. Indeed, when the Reavers purchased the Property, it is far more likely that they relied on the commitment by the title insurers for purposes of satisfying themselves that the purchased property was unencumbered.[7]

Because TRG has not produced any evidence on the reliance issue, the Court need not reach the issue of whether any reliance was "justifiable." No genuine issue

---

[7] Of course, this scenario highlights why so many real estate transactions involve title insurance. Buyers and lenders need not do their own diligence with respect to the existence of encumbrances. They need not rely on representations from sellers either. Rather, title insurers conduct the investigation, and buyers and lenders rely on that investigation.

of material fact exists with respect to an essential element of TRG's section 523(a)(2)(A) claim. Thus, Defendant is entitled to judgment as a matter of law.

*d. Reliance Was Proximate Cause of Loss*

Finally, having failed to demonstrate any reliance on the Affidavit, it is impossible for TRG to prove that the Reavers' reliance was the proximate cause of any loss.

Defendant asserts in the Motion that because the Reavers were "made whole" under their title insurance policy, no loss was proximately caused by Defendant. TRG responds by noting that a loss was suffered by the Reavers. Their home was foreclosed upon. The fact that the Reavers had title insurance to pay the redemption amount and save their home from such foreclosure, TRG argues, should not prevent it from asserting this claim in its capacity as subrogee.

The Court believes that the Reavers quite clearly suffered a loss. TRG, in its capacity as subrogee, was entitled to pursue a claim for such loss against the Defendant. However, given the Court's ruling that there is no genuine dispute regarding justifiable reliance, the Court need not reach a determination on the issue of whether any reliance was the proximate cause of the aforementioned loss.

## V. Conclusion

Even when viewing the evidence in the light most favorable to TRG, Defendant is entitled to summary judgment pursuant to Civil Rule 56 with respect

to the sole count in the Complaint. Therefore, this adversary proceeding shall be dismissed. The Court will enter a separate order consistent with this Opinion.

**Signed on September 18, 2026**

**/s/ Paul R. Hage**

**Paul R. Hage**
**United States Bankruptcy Judge**